Case number 12-4003 Thomas Barton v. Warden Southern Ohio Correctional Facility Oral Argument not to exceed 15 minutes per side Mr. Pagan for the appellant May it please the court, my name is Chris Pagan and I represent the appellant here and I'd like to reserve three minutes for rebuttal please. The state's theory of criminal liability in this case was that there were two brothers, one named Henson and one named Phelps, and that they operated a burglary-for-hire ring in Warren County in Butler County, Ohio, and that my client, Mr. Barton, patronized that ring with a motive to scare his wife into moving from the country into the city so that he would be eligible to be the police chief in the city of Springboro. The state's evidence on those points was very, very thin to say the least. There was no confession, there were no eyewitnesses, there was no real forensic evidence, there was no medical evidence, and the motive that they put forward in court was substantially debunked. On top of that, there was substantial and real Brady evidence that was suppressed by the state. The Brady evidence in this case involved Henson's statement to the police that we believe was untrue that he had also committed a burglary-for-hire involving a guy by the name of James Kelly and that he had done that for the exact same motive that he acted in the Barton case, and that was to scare the Kelly family into moving from the countryside into the city. Under the classic definition, though, of Brady, how does the evidence that you're characterizing really meet the test in Brady? Was it exculpatory is your question? Yes. It was exculpatory because the state's theory, what they pointed to the jury was that this man, Henson, ran a burglary-for-hire ring, and the Kelly evidence debunked that entire theory. At trial, Mr. Henson was asked, name one person that you've done a burglary-for-hire for, and he couldn't name anybody, and they suppressed this Kelly evidence, and that would have placed the entire case and the entire state's theory in a new light, and it would have altered the probabilities of the case, and that's because the jury would have been left with deciding whether or not it was realistic and probable that Gary Henson and his brother Phelps were in this small county and operating a burglary-for-hire ring in which somehow they would find men that lived in the country and wanted to scare their wives into moving into the city, and they somehow, these people, these homeowners, somehow stumbled across Gary Henson, who seemed to be in the business of scaring wives in fake burglaries. That's the state's theory. Was that true, or was Gary Henson just a burglar, and lying about what he did in the Barton case and in the Kelly case to displace his own criminality and his own behavior on the innocent people? So did the state at the trial, did the state present Henson as doing a burglary-for-hire in the Kelly case? Was that evidence that was presented in that fashion? The district court alluded to the fact that it had been disclosed, but factually it did not, and I would cite the court to document 18.1, page ID number 1379. And the state prosecutor, I have the transcript right in front of me, the state prosecutor said, have you been involved in an incident before where that happened? Yes. What happened? Lady came home. We was in the process of laying out the house. It wasn't an insurance job, though, but we was in the process of laying out the house, and she seen us. She ran. Nothing was ever come of it. I guess what I'm saying is it taught us that somebody is scared. They're not taking the time to remember your license plate or your car, or probably what you look like. So that's the allusion to the Kelly burglary, the only allusion in the Kelly burglary that was in the state court trial record, and it didn't identify the name Kelly. It didn't talk about a burglary for hire. It only vaguely alluded to it, and the district court was wrong in its assertion and its opinion that it had been disclosed in the trial itself. I'm a little confused. Did the prosecutor present that job as a burglary for hire? Vaguely. He presented it as it wasn't an insurance job, but what she said is, have you been involved in an incident before where that happened? Happened, a burglary for hire. Yeah, it wasn't an insurance job, and we did this burglary. You just put in an incident before that happened, and then you said burglary for hire. That's not your words, or? Again, you can look at the transcript yourself to get how it was characterized, but at this point in the trial that we're talking about, the prosecutor was asking about whether or not you'd been involved in a case where you faked a burglary and shot over somebody's head and tried to scare someone, and he says, yes, it wasn't an insurance job, and this is what happened. It was an insurance job? Is that what you're saying? It was not an insurance job, because he had testified before that, yeah, I'm in a burglary for hire ring. Sometimes I do it for people that want to make fraudulent insurance claims. The Barton case wasn't one of those, and he alludes to this Kelly incident, but didn't name Kelly and didn't say that it was specifically exactly like the Barton case. So the Kelly case file was disclosed by the state? No. The only thing that was disclosed was the burglary report that didn't have James Kelly's name on it, didn't have Gary Henson's name on it, didn't have Phelps's name on it, talked about a real burglary where there was real injury. It didn't talk about the fact that it was faked. All he did was provide... Was there a burglary in that? Pardon me? It was injury in the Kelly one? No. Becky Kelly... You said that. I'm sorry. Did I say that? Okay. I didn't mean to say that. The only thing that they disclosed, and that was the question, was a police report. That's it. And what they suppressed was Henson's statement to the police that he did that burglary for Mr. Kelly, for hire, for the purpose of scaring his wife into moving from the countryside. So there was just this random report in there for no reason? Yes. That's right. And what you have to understand is this was a nine-year-old case. It was a very high-profile case at the time. It was litigated, and there was a huge document dump from the state to the defense in this case, and it was buried in the middle of discovery, although designated as braiding material. And how was it discovered that Henson had all these connections to that robbery and that the Kellys denied that they had paid? In post-conviction litigation, the Barton family hired a private investigator who interviewed the Kellys, and it was revealed in post-conviction litigation. After final conviction, when direct appeal was happening, so in state post-conviction. So an initial... Sorry. Go ahead. I was going to take us to the question of what standard of review... It's the big question. Right. Right. De Novo. And what's your best case? Well, there's four. Without question, the last reasoned decision was the Ohio Court of Appeals, and it decided the case on res judicata, so a procedural bar. And there was never an adjudication at any level, we claim, of the Brady claim on the merits. What about the Ohio Trial Court? Right. Consider that... No. Well, first, because the last reasoned court decision was explicitly decided on res judicata, and you don't go beyond that. Second, your sister courts in the Third and the Seventh and the Ninth Circuit applied the preclusive stripping doctrine, and that is, if there is a higher court determination on procedural bar, and there was a lower court decision that was adjudicated on the merits, that lower court decision is stripped of its preclusive effect when the higher court decides on procedural bar. That's called preclusive stripping. So the decision of the trial court would have been stripped of its adjudication. Suppose, hypothetically, you had a situation where the state trial court says, we decide on the merits, and the state appeals court says, we don't need to get to the merits because we're going to decide on procedural default. What should we do in those circumstances? There's preclusion stripping, and you look to the last court decision, which is the procedural default, and you say, there's no longer an adjudication on the merits in state court because it was stripped by the procedural default decision of the higher court. And what is your best case to say, hopefully a Supreme Court or Sixth Circuit case that says that we would ignore a definitive decision on the merits by a lower court because there's a definitive decision on the procedural default by a higher court? The Supreme Court hasn't decided preclusive stripping yet. This Circuit has not. The Third, the Seventh, and the Ninth have. The Thomas case out of the Third. The Amato v. Gonzalez case out of the Ninth that was just decided in 2013. And the Legakos v. Cook case out of the Seventh. And they all go the same way? They all go the same way, and there's no dissenting view on preclusive stripping. Are there other circuits that go the other way? No, there's not. So there's a Supreme Court case, YILST, and I think that's a good case for me because that, YILST, Y-L-S-T, I think I'm pronouncing that right, and that stands for the proposition that if there's an explicit determination by the last reason court about how the case is decided, you stop there. My second argument is preclusive stripping that we've already gone over. My third argument is that if you read the state court decision, and I have it here, that it explicitly decided on procedural default as well, and that there's not a fair reading that there was an adjudication on the merits. You're now talking about the state trial court. I am. It decided it on res judicata too. And it did so in two sentences. As the state points out in post-conviction petition, it is not a substitute for direct appeal. By not raising any Brady issues on direct appeal, the defendant is barred from raising it here. Stop. And what's your answer to that? That the state judge decided it on a procedural bar just like the court of appeals. Now there's a couple of other sentences that follow that, that I contend are just contingent dicta speculation meandering. But what the state court judge went on to say was, one, I have reservations about whether or not the Brady evidence would be admissible. Reservations, not a holding. Two, and this is important, I'm not going to speculate on how that evidence would have a trial outcome. Now that's critical because that's the state trial judge saying, I'm not going to do what Brady requires of me on the third element, which is measure the evidence against the trial outcome to determine whether or not there's materiality. And by doing something contrary to the Brady decision, I think that that would trigger. So even if you got to the state court decision in these contingent discussions, I think you would find that there wouldn't be a deference because the state court adjudicated our claim contrary to Brady's third element. And then the state court judge went on to say, and you know what, the trial attorney in this case had lots of options and maybe he just used his judgment and discretion in not approaching this evidence and presenting it. And that introduces an ineffective assistance claim or an element in a Brady analysis, which again, conflates two different tests and is contrary to Brady. So if we thought that ADEPA did apply, you're saying you would win anyway? I think it's a harder case. But I think clearly, I've given you four reasons why ADEPA doesn't apply. It's explicit, preclusion stripping, the trial court judge himself found it on procedural bar and contrary to. So one, two, and three, and four. And contrary to is saying that even if, because that's an ADEPA standard, so saying that you would meet an ADEPA standard. That's a fair way to characterize it because, and again, I want to feel like I've been heard and say this clearly. The state court judge said, I'm not going to speculate about what that evidence means and how it affected the trial outcome. That's contrary to. And by introducing ineffective assistance of counsel elements into the Brady analysis, they're conflating two different tests, which again is contrary to. So I think we would carry the day on ADEPA for that. Thank you. Your red light is on. Wow. Okay. Thank you. Time flies. Good morning, your honors. My name is Scott Chris. I'm here on behalf of the attorney general representing the warden. I'd like to create, or correct a few misstatements. Henson was not displacing his own liability by making up a story about Mr. Barton. It was established that Mr. Henson was not available to participate in the Barton robbery, so, or burglary, so he was never a suspect in the case. So he was not trying to deflect blame onto someone else, namely Mr. Barton, by making up some story. And you say he was in custody at that time? I'm sorry? He was in custody at that time. I believe that's correct, on a different charge. But he could have had involvement in being solicited for the job and in arranging for the job to be done. And he could have been potentially criminally liable, couldn't he? I think the testimony was that it was Phelps, was sort of the ringleader, and that Phelps had told him about this job, and it was Phelps who collected the job and had spoken with Barton. But ultimately... That testimony was all from Henson, correct? Correct. But that ultimately Henson was not available to participate. So he was never considered a suspect by the police as far as I'm aware. But the theory was that he had set up this fake burglary, right? That Phelps had set up the fake burglary at the Pets to Barton. The Kelly burglary report was not suppressed. It was given to the defense during discovery. Was there anything that would tip off anyone that there was this theory that the state was going to espouse, that there was a fake burglary ring to cause wives to want to leave the countryside? Certainly there was nothing direct, but as Judge White said sort of disbelievingly, was it random that that report was included in the discovery? During the post-conviction proceedings, Barton's investigator submitted an affidavit in which he said he spent hundreds of hours pre-trial interviewing hundreds of people about this case. Certainly the connection could easily have been made with the discovery report. Why would the state not provide all of the evidence? I'm sorry? Why would the state not provide all of the evidence? If they're going to give the Kelly burglary report, why wouldn't they give the additional information that seems to be the critical information? I'm not sure that there is any evidence in the record that there was other information. It's not clear in the record that there was any report generated, any witness statements generated by the reinvestigation in 2004. They interviewed him, didn't they? Didn't they interview Henson? Yeah, the police interviewed Henson, and his statements were given in narrative form, I believe, during the discovery. No, they interviewed Henson in connection with the Kelly matter, didn't they? I don't believe at the time of the burglary. No, I don't believe so. The Kelly burglary was in 1993, I believe. Sometime before the Vorton's trial, the police had spoken to Henson about the Kelly burglary, right? I can't be certain on that. I believe so, yes. I mean, I think that's the assumption in the record. But I don't know that there was any report generated or a specific written statement by Henson about the Kelly burglary. But it was clear that the Kelly burglary was not included in the discovery by accident. I mean, it seems to me to be a completely different position to say there were no materials. That's what you're saying now, that there were no Brady materials. There was a police report and nothing else. Is that true? Then why are we here? I would ask you the same question. You're representing that there was nothing else there. I don't- And all the information that was obtained was just the investigator going out and speaking to people. That there was no- The investigator for Mr. Barton going out and speaking to people long after the trial, yes. That's when they got the affidavits from the Kelly mother and daughter who said that the investigators had talked to them in 2004. They denied that there was a staged burglary. Their father denied that there was a staged burglary. And that's all the further that it had gone. What is your position in this court? Is it that there is no Brady evidence? Or is it that there was no obligation to disclose the Brady evidence? My position is that there's no evidence that there was Brady evidence to disclose. And did you make that argument in the district court? I don't believe- And really the crux of this case is the materiality. Regardless of whether or not there was evidence that was suppressed, it's plainly not material. As the trial court found, the jury could have just as easily found that there was a ring of truth in Jim Kelly's supposed testimony. What he would have testified to was that Henson was lying about a staged burglary. But if, as is the case, credibility is always central to every witness and there is evidence which reasonably might cause a jury to assess credibility different, why wouldn't that be material? Well, the test is whether there's a reasonable probability that the outcome would have been different, not whether it might have been different. And putting the facts of the Kelly burglary before the Barton jury simply would not have helped Mr. Barton because- There's actually a mirror image of the burglary that the jury is assessing. That's correct. Are you saying that that's not the probability that that would have caused the jury to make a different assessment of the credibility of that witness? In a small community like that, that you would have these mirror image burglaries? I'm saying that's in fact inculpating. That substantiates the credibility of Henson. He's saying that he's done this before. I did this case, it wasn't an insurance case, but we did this before where we had faked a burglary and shot over the head of a lady. Well, those facts are exactly the same as the Kelly burglary. Then you have the evidence that is the purported Brady material that was suppressed, that the Kellys did not believe that it was such a case. Now, your point that Mrs. Kelly and Ms. Kelly have affidavits that are after the fact, after the trial occurred in this case, is a timing problem for your opponent. But your opponent argues that there's other evidence that shows that this was a made-up story by Henson. If Henson, who apparently lied on other matters, lies about the Kelly matter being a burglary for hire, why wouldn't the jury be more likely to believe that Henson was lying when he says that Barton hired his crew to do a burglary? Well, it's clear that there was no shortage of evidence demonstrating that Henson had credibility problems. He was a career criminal. He had engaged in falsification-type offenses before. That was all brought out on cross. So the defense did everything it could to damage the credibility of Henson. And having Jim Kelly stand up there and deny that he collaborated with Henson on a prior robbery doesn't eat away at Henson's credibility. Of course Jim Kelly is going to deny that he was involved in it. It was sort of an insurance fraud type of a thing. He's not going to sit on the witness chair and say that he participated in a robbery of his own home. The problem is, though, that you're saying now that it wouldn't have affected the outcome. But you, the prosecutor, are making the decision that this would have no bearing. But it's clearly, I believe, relevant to credibility. And the defense doesn't get an opportunity to assess one way or the other whether or not they can use that to challenge credibility in a way that makes a material difference in the trial. You're making that decision on the front end, and that's problematic. Well, I don't deny that it could have been used by the jury to assess credibility. What I disagree with, respectfully, is that it rose to the level of materiality that it would have. It created a reasonable probability that the outcome of the trial would have been different. Given all of the credibility difficulties that Henson had to begin with, having someone stand up there and say, oh, well, I didn't participate with him in this particular robbery. When the facts of the robbery would have come out if Jim Kelly would have testified, and it would have looked exactly like Henson said, and looked exactly like the Barton robbery. I don't purport to know all of the evidence that came in, but it sounds like there was absolutely no physical evidence linking this man. It was his wife. It was his home. He wasn't there. The only thing that links him, and you have Henson, who wasn't there either, who testifies to what his dead brother told him, and the only evidence that links him is Henson's testimony that he asked him to do this, but he was in jail. And that's what he's convicted on. What originally put them on to Phelps and Henson was the recording of the 911 call, in which Mr. Barton said, I got to call Phelps man. And the investigating officer who was doing the reinvestigation, the cold case squad, remembered that there was a Phelps name in the file, and connected that with Henson. Phelps was dead at that point. And I was sort of curious, he said it to the... He said it to the 911 operator. He said it to the 911 operator. His defense at trial was, oh, what he really said was, I got to call for help. Well, that of course doesn't make sense, given that he was talking to the 911 operator who told him help was on the way. It totally doesn't make any sense to tell the 911 operator, I got to call the guy who I hired to rob my house so that my wife would move to the city. I mean, it makes no sense at all. Admittedly, Barton was also panicked at that point because he didn't intend for his wife to be dead. He panicked because he said, I got to call for help. Yeah, no, he had already called for help. Yeah, but it doesn't make sense. Nothing makes sense here. The 911 tape also showed that he was wrestling around the house, and he wasn't in front of the phone at all the times necessarily. He was on a corded phone, then he was on a cordless phone. And he might have just been talking to himself out loud, what do I have to do, what's going on here, I got to call Phelps to find out what happened. Did he say that out loud? Yeah, he did. Did he mean to? Probably not. Was there an allegation that his wife really was messing around with Phelps? That was an original story that Henson told, I believe.  The case went cold when it was... Henson was lying. Originally, apparently when he was originally interviewed, I believe back in 1995, when it was originally investigated. But if the whole theory of the prosecutor is that these two brothers are running an operation which was burglary for hire, how could it not be relevant that here's another case where they're claiming they did burglary for hire and these other people deny it? Now, sure, you can say, well, they wouldn't admit it, but it's something for the jury, I would think. I mean, that's certainly true of any type of information that comes up after the trial. All we can do is speculate on what effect it would have had on the jury. And here we have to determine whether there was a reasonable probability that that information would have made a difference. And I think it's... Getting to that question of the standard of review and what is the state court decision that we look at. I believe, as the magistrate found, that you look through the court of appeals decision and rely upon the trial court's decision on the post-conviction petition. If the court of appeals decided explicitly only on procedural default, what is your best case from the Supreme Court or the Sixth Circuit or any other court of appeals that would say we would look through? Yield's case that Chris talked about is the case where there's no reason decision. There is a reason decision. There is a reason decision that it's a procedural default. Right. There's no reason decision on the merits. And I don't believe that there is a specific case in the Sixth Circuit or the United States Supreme Court that discusses when there is a mistaken procedural default relied upon by a higher court whether the merits determination can be relied on in the state court, in the trial court. You're agreeing that the state court of appeals decision that there was procedural default is not correct? I think it's a tough argument to make. I mean, I made a good faith argument, but I'm not going to shoot myself in the foot. I don't think it's a very convincing argument that he could have brought it on direct appeal. It's extraordinarily difficult to bring a Brady claim on direct appeal. Nevertheless, whether we have difference to the state court, the trial court, which I believe is correct, or whether or not you decide the materiality prong, de novo, I think the state wins on this. Did the state trial court decide the materiality prong? Yes, it did. Did it apply the correct test? Yes, it cited the Brady case and acknowledged that it was deciding a Brady issue, and it said in its decision that it found that both burglaries were similar, and just because Kelly denied it would have denied it doesn't mean that the jury would have believed him, and conversely that they might have found a ring of truth in the similarity between the crimes. And I think that goes to the materiality prong, and whether there was a reasonable probability that that testimony would have. They don't use magic words at all, a reasonable probability. They do not, but they don't have to use magic words. In Harrington v. Richter, the Supreme Court decided that the state court doesn't have to expound at length on the standard or use the magic words as long as it gets the result correct. Unless you have any other questions. Thank you. Is his time consecutive? Chris will probably be able to answer that question. I believe that they were concurrent sentences. Thank you. I've lived with this case for 10 years, so I do know the facts, and he did get a consecutive sentence. He got 5 to 25 and 10 to 25 run consecutively. And Scott's point about the fact that Henson was incarcerated and didn't participate is not reflected in the record. In fact, he and his brother allegedly received the statements from Barton that he wanted this burglary for hire to happen before Barton was in. Can you say this again? Henson went into jail in March, and prior to that, he and his brother had began the preparations for the burglary for hire, allegedly, in the Barton household. So he was a participant in this conspiracy. He just couldn't fulfill the end of it, which is the entry into the home, because he was incarcerated. But he and his brother had staked out the house and done things in preparation for the burglary before he was incarcerated. But the main point that I want to get across here is that my opponent says that he denies that there was suppression, but that's not how the state itself, the prosecutor's office itself, and state litigation conceded that they had suppressed it. And the best evidence of that is Investigator Newsom's affidavit that was appended to the state prosecutor's response in post-conviction. And in paragraphs 6, 7, and 8, they explain why they did what they did. In paragraph 6, Investigator Newsom said, we gave you the report, and you should find the rest. In paragraph 7, he says, I didn't believe Kelly when he told me that he hadn't hired Henson and Phelps, and because I don't believe him, we don't turn it over. And then lastly, he said in paragraph 8, which Scott has argued here, is we think that the evidence was inculpatory and not exculpatory, so we didn't have to reveal it. Which makes little sense, because they did provide the burglary report itself, which shows to me that they understood it was Brady. But they withheld the stuff that made it material. So two questions. One, is there a page that you have for that, or is it Newsom's affidavit? It's Newsom's affidavit, and it's in the state's response, and I could run to my desk and get you that. No, that's okay. Okay. The second question, as I understand the state's argument here, there's no Brady material because there's nothing in writing. Was there some evidentiary material that they needed to turn over? No, it was the substance of interviews. Henson told the police I did this with Kelly. Kelly told them that's absolutely a lie. The police said, we want you to testify against Barton, and he said, I'm not going to do that. And they said, if you don't, we're going to charge you with obstruction of justice. And then Kelly went and got an attorney, and nothing ever came out of it. So there were three aspects of the Brady evidence. One is what Henson told the police. But none of it has been perpetuated in writing. Absolutely not. The only thing that was in writing was the burglary report, which was totally innocuous. It never had James Kelly's name on it. It didn't have Henson's name on it. It didn't have Phelps' name on it. It didn't have burglary for hire on it. It had Becky Kelly's name on it. So what case would support your argument that even though this is oral interview information, Brady applies? I don't know of a case that says that evidence has to be documentary evidence. And the state did not argue that below? They did not argue that. No, they didn't argue that below. Are you conceding that there were no notes from any of these conversations? I'm not aware of them. What I'm aware of is that we found out through our investigator that this Kelly stuff happened. And then when we presented it in state court, they said, yeah, we gave you the police report. That was enough. And by the way, we didn't tell you the rest of it because we didn't believe it. And you know what? We think it's inculpatory and not exculpatory. That's all a nuisance affidavit. And that's how they defend it. They defended it on a reasonable diligence defense, which is it was your responsibility once we gave you the report to understand its significance, go out and find James Kelly, talk to James Kelly, find out what he has to say, and then use it. But the problem with a reasonable diligence defense is the Supreme Court has said, look, when you make a promise by providing Brady evidence that you've given everything you need to, the defense doesn't have to go any further than that. But if in fact there was nothing, as you just conceded, I think, if there was nothing written from interview notes or anything else that tied all this together, what were they obligated to give to the defense? And what part of this, what is the violation for the due diligence purposes occur? Okay. Two questions. What were they supposed to give? They were supposed to give a summary to the defense under Ohio rules of procedure that say, we've orally interviewed the Kellys and this is what they've told us and it's exculpatory. Now, I'm sorry, the last aspect of your question I missed. Well, I think that part answers that because I was saying where did the breach occur? Where was the lack of diligence? And it would be in not writing the summary and handing it over. Now, all this stuff happened before Barton was indicted. This investigation from the Cold Case Squad, they got all that information before. That's why they knew the burglary report had some Brady significance. And, again, they withheld the important stuff and gave the stuff that was innocuous. And then the last point on the reasonable diligence defense is the state court judge in this case made an order, and it's reflected in his post-conviction decision. He required the state prosecutors to turn over every statement that Henson made, every statement. And I'll read you the order. The court required the prosecution to produce every statement made by Henson because of the suggestion by the defense that he was totally unreliable. They didn't follow that order. My clients were allowed, Barton was allowed to rely on the idea that the state court, the state prosecutors fulfilled their promise and gave over every statement that Henson made, and they didn't do it. And that was an order by the state trial court. Right. Yes, ma'am. In trial proceedings as opposed to in post-conviction. That's right. And his statement that they didn't hand over was? Henson's statement to the Cold Squad investigators that he had been hired by Mr. Kelly to do a burglary for hire with the motive of scaring his wife into moving from the countryside and into the city. And under Ohio law, if it's an oral statement, they're supposed to reduce it to writing? Under Ohio criminal procedure, all Brady evidence, whether or not it's a statement or what have you, needs to be turned over. It's Criminal Rule 16, and that includes summaries of oral statements. I know, but if there wasn't a summary, you seem to be conceding that there was no summary. I have no idea if there was a summary or not. It's never been provided to me. All I know is that they've acknowledged this interview took place in an affidavit and that they didn't turn it over because, again, we gave you the report and that's enough and we didn't have to tell you the rest of it, and we didn't believe them. Maybe they didn't take notes because they didn't believe them, but it's not their job to decide credibility. It's a jury's job to decide credibility. With respect to the question about what to do about the Ohio Court of Appeals decision, it seems like the state's argument, at least an oral argument, is that the state court of appeals was wrong to decide on procedural default, although there's a little waffling on that. If the state court of appeals was wrong to decide on procedural default, then we look to the last reasoned decision on the merits, of which there's only one decision query whether it's reasoned, which is the state trial court decision, which is basically one long paragraph. So how do you respond to that? Because it's not procedural default here, therefore, where was there a merits decision? There was a merits decision, arguably, by the state court. I don't concede that, but I take your point. I don't think that a habeas court looks to the last reasoned opinion and then makes a decision on the basis of state law as to whether or not it was right or not on procedural default. I think your job is to look at how they decided it. Was there an adjudication on the merits or not? And if there wasn't, and it's explicit that it was decided on procedural default, then you stop there, and then there has been no adjudication on the merits. And then we decide whether there was, in fact, a procedural default. Is that right? Well, that hasn't been argued to you. But don't we have to say there was not a procedural default in order for us to get to the merits? I think you have to decide whether or not there was an adjudication on the merits at the state court appellate decision, and there wasn't. And then I think that that ends the day because of preclusion stripping. If they decided the case on procedural default only, then the lower court's decision, I'm not conceding that it was decided on the merits, but even if it was, the preclusive effect of that merits decision goes away because the state court is superior, and the lower court could never longer be an adjudication on the merits because it wouldn't have any preclusive effect. There would never be any issue preclusion that could arise from it because that decision evaporated on the merits when the state court decision was decided on procedural default only. Thank you. But I think Judge Moore was asking a different question, which is we have to, and maybe it's not seriously contested, but we have to find that the state appellate court was wrong in its procedural default ruling to even get as far as you want us to get. Yeah, I mean if you find, right, right. Because if there was a procedural default, then I can't make my claim. But the district court said there wasn't a procedural default. I think I'm hearing a concession that there wasn't. You could make an actual innocence. Right, and I made that in the district court, and I haven't made it because I felt like the case was strong enough otherwise that I haven't made it. But the point, actually the point that you bring up about procedural default is that the cause and prejudice would be satisfied here because the cause of the procedural default was their suppression in the first instance, and then the prejudice tracks the Brady elements anyways. So it shouldn't hamper my case too much, even if you found procedural default. Thank you. Thank you. The case will be submitted. Would the court call the next case, please?